IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEVIN JACKSON,

        Plaintiff,               No. 2:09-cv-3234 KJN P

    vs.

TESSIE RALLOS, M.D., et al.,

        Defendants.        <u>ORDER</u>

_____/

I. <u>Introduction</u>

        Plaintiff, a state prisoner proceeding through counsel, seeks relief pursuant to 42 U.S.C. § 1983. The parties have consented to proceed before the undersigned for all purposes. <u>See</u> 28 U.S.C. § 636(c). Pending before the court is defendants' motion for summary judgment, filed May 20, 2011. Plaintiff filed an opposition, and defendants filed a reply. The motion was heard before this court on June 30, 2011. Plaintiff was represented telephonically by Karen Travis; defendants were represented by Martha Stringer. For the reasons set forth below, this court finds that defendants' motion for summary judgment is granted as to defendants Rohrer and Mahon-Howe, and denied as to defendants Rallos and Traquina.

////

////

1

II.  <u>Complaint</u>

This case is proceeding on count one of the original complaint, filed November 19, 2009.[1]  Plaintiff alleges that defendants violated plaintiff's Eighth Amendment rights by failing to provide plaintiff with adequate physical therapy following plaintiff's January 24, 2007 total right knee replacement, a serious medical procedure.  (Dkt. No. 1 at 7.)  Plaintiff contends defendants knew that physical therapy following that surgery was essential for the surgery to succeed, and that defendants knew, or should have known, that if the initial replacement fails, a second knee replacement is highly dangerous, less likely to succeed, and carries a high risk of permanent crippling.  Plaintiff contends defendants consciously disregarded these risks, in deliberate indifference to plaintiff's serious medical needs.  As a consequence, plaintiff alleges that his first knee replacement failed, and he suffered additional severe injury to his opposite hip due to his crippling walk, which causes plaintiff constant pain, and he suffered a three-year delay before undergoing a revision of the failed knee replacement.  (<u>Id.</u>)

III.  <u>Motion for Summary Judgment</u>

Defendants move for summary judgment on the grounds that defendants' medical treatment does not constitute deliberate indifference.[2]  (Dkt. No. 38 at 2.)  At the hearing on the instant motion, plaintiff's counsel confirmed that plaintiff challenges the failure of defendants to comply with Dr. Shifflett's March 8, 2007 order for "more aggressive physical therapy," and

---

[1]  Count two of the complaint was dismissed on August 25, 2010.  (Dkt. No. 18.) Defendant Noriega was dismissed on October 18, 2010.  (Dkt. No. 22.)

[2]  Initially, defendants object that plaintiff failed to serve a Rule 26 disclosure and failed to supplement that non-disclosure with a declaration or identification of Jon Greenfield, M.D. Defendants claim they served their "Rule 16" disclosure on December 17, 2010 (dkt. no. 38-2 at 1), and because plaintiff failed to disclose or reasonably supplement pursuant to Fed. R. Civ. P. 26(e)(2), there are grounds to exclude Greenfield's testimony under Fed. R. Civ. P. 37(c)(1). However, plaintiff plans to call Dr. Greenfield as an expert witness, and the court's initial scheduling order did not provide a deadline for expert witness disclosure.  Under Rule 26(a)(2)(i) of the Federal Rules of Civil Procedure, expert disclosure is required at least 90 days before the date set for trial.  Because no trial date has yet been set, plaintiff has not violated Rule 26(a)(2)(i).

1 does not challenge the provision of physical therapy, or lack thereof, from the date of surgery,

2 January 24, 2007, to March 7, 2007.  Rather, plaintiff claims that defendants failed to provide

3 plaintiff with hands on physical therapy from March 8, 2007, through June 2010, when plaintiff

4 received the second knee replacement surgery on his right knee, and this lack of physical therapy

5 was allegedly in deliberate indifference to plaintiff's serious medical needs.  Plaintiff contends

6 that defendants issued routine requests for physical therapy, knowing the therapy was not likely

7 to be provided, and failed to expedite the requests or follow-up to ensure plaintiff received the

8 "more aggressive" physical therapy Dr. Shifflett ordered.

9                              A.  Legal Standard for Summary Judgment

10              Summary judgment is appropriate when it is demonstrated that the standard set

11 forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if

12 the movant shows that there is no genuine dispute as to any material fact and the movant is

13 entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[3]

14              Under summary judgment practice, the moving party always bears
                the initial responsibility of informing the district court of the basis
15              for its motion, and identifying those portions of "the pleadings,
                depositions, answers to interrogatories, and admissions on file,
16              together with the affidavits, if any," which it believes demonstrate
                the absence of a genuine issue of material fact.

17

18 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

19 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

20 only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

21 Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

22 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

23 committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

24 _____

25      [3] Rule 56 was revised and rearranged effective December 10, 2010.  However, "[t]he
standard for granting summary judgment remains unchanged."  Advisory Committee Notes to the
26 2010 Amendments to Rule 56.

1    burden of production may rely on a showing that a party who does have the trial burden cannot

2    produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

3    should be entered, after adequate time for discovery and upon motion, against a party who fails to

4    make a showing sufficient to establish the existence of an element essential to that party's case,

5    and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

6    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

7    necessarily renders all other facts immaterial."  Id. at 323.

8            Consequently, if the moving party meets its initial responsibility, the burden then

9    shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

10   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

11   to establish the existence of such a factual dispute, the opposing party may not rely upon the

12   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

13   form of affidavits, and/or admissible discovery material in support of its contention that such a

14   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

15   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

16   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

17   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

18   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

19   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

20   1436 (9th Cir. 1987).

21           In the endeavor to establish the existence of a factual dispute, the opposing party

22   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

23   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

24   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

25   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

26   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1    committee's note on 1963 amendments).

2            In resolving a summary judgment motion, the court examines the pleadings,

3    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

5    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

6    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

7    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

9    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11   show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

12   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

14            B.  Civil Rights Claims Standards

15            The Civil Rights Act under which this action was filed provides as follows:

16           Every person who, under color of [state law] . . . subjects, or causes
             to be subjected, any citizen of the United States . . . to the
17           deprivation of any rights, privileges, or immunities secured by the
             Constitution . . . shall be liable to the party injured in an action at
18           law, suit in equity, or other proper proceeding for redress.

19   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

20   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

21   Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

22   § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

23   (no affirmative link between the incidents of police misconduct and the adoption of any plan or

24   policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

25   another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an

26   affirmative act, participates in another's affirmative acts or omits to perform an act which he is

                                                    5

1  legally required to do that causes the deprivation of which complaint is made." <u>Johnson v.</u>

2  <u>Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

3  IV.  <u>Undisputed Facts</u>

4        For purposes of the instant motion for summary judgment, the court finds the

5  following facts undisputed, except as otherwise noted.[4]

6        1.  At all times relevant herein, plaintiff was a state prisoner incarcerated at the

7  California State Prison, Solano ("CSP-Solano").

8        2.  From 2003 to May 2007, defendant Dr. Alvaro Traquina was the Chief

9  Medical Officer ("CMO") and the Health Care Manager ("HCM") at CSP-Solano.  As CMO,

10 defendant Traquina's duties in connection to patient care were to oversee the operations of the

11 clinics, and to respond to health care delivery problems presented by institution staff or

12 managers.  As HCM, defendant Traquina managed the transfer of patients to or from other

13 institutions and community providers.  In June 2007, another individual assumed the title and

14 duties of HCM.

15       3.  Defendant Dr. Jason Rohrer is a primary care physician at CSP-Solano.

16       4.  Defendant Dr. Tessie Rallos is a primary care physician at CSP-Solano.  The

17 signature stamp used in medical records identifies defendant Rallos as a physician and surgeon.

18 (Dkt. No. 28-1 at 7.)

19       5.  Defendant Kathleen Mahon-Howe was a family nurse practitioner at CSP-

20 Solano who submitted referrals for physical therapy.

21       6.  None of the defendants is a physical therapist, and defendants claim each must

22 rely on the physical therapist to prescribe plaintiff's treatment.

23       7.  Dr. Michael Shifflett is an orthopedic surgeon at Queen of the Valley Hospital

24 ("QVH").

25 ───────────────

26    [4] As noted above, plaintiff's claim concerns the treatment or alleged lack thereof after
   March 8, 2007, however, earlier events are set forth herein as they relate to the operative dates.

1           8.  On January 24, 2007, Dr. Shifflett performed a total knee arthroplasty

2  (replacement) on plaintiff at QVH.

3           9.  Plaintiff was an inpatient in the acute care section of QVH for two days after

4  surgery and was then transferred into the rehabilitation side of QVH for occupational and

5  physical therapy for three days after surgery.

6           10.  Dr. Corby Kessler is a physiatrist at the rehabilitation department of QVH.

7           11.  Dr. Kessler supervised plaintiff's physical therapy between January 26 and

8  January 29, 2007, at QVH.

9           12.  On January 27, 2007, Dr. Kessler dictated health and physical exam notes,

10  stating:

11        We will continue with endurance and strengthening program.
Because of the situation where [plaintiff] lives he will need to be
12        fairly mobile and independent.  It is expected that little post
hospitalization physical therapy will be available.  The patient will
13        be provided comprehensive instructions on how to perform an
appropriate home exercise program, continued strength and
14        endurance building. . . .

15  (Dkt. No. 30 at 20.)  Plaintiff contends that because the instructions are not available for review,

16  it is not possible to determine if they were "comprehensive."

17           13.  Dr. Kessler, in his January 29, 2007 discharge summary, discharge follow-up

18  section, stated:

19        The patient is being discharged to CSP-Solano.  He has done very
well with this program.  No additional physical therapy is
20        indicated.  No orthopedic followup is indicated.  A physician can
remove the staples and attend to any followup incision issues after
21        discharge.

22  (Dkt. No. 30 at 16.)

23           14.  Plaintiff was discharged back to CSP-Solano on January 29, 2007.

24           15.  While in the rehabilitation side of QVH, plaintiff was given physical therapy

25  so plaintiff could learn to do exercises for his right knee.  (Dkt. No. 27-2 at 10.)  Defendants

26  contend that at discharge from QVH, plaintiff was given a comprehensive set of instructions on

1  how to perform an appropriate home exercise program and continued strength and endurance

2  building.  Plaintiff argues that because the alleged instructions are not currently available, it is

3  not possible to determine whether or not they were "comprehensive."  In deposition, plaintiff

4  stated he could not recall Dr. Kessler personally giving plaintiff any instructions about what

5  plaintiff should do to rehabilitate plaintiff's knee on his own.  (Dkt. No. 27-2 at 10.)

6          16.  After the knee replacement in January 2007, Dr. Shifflett, by telephone order,

7  ordered a Continuous Passive Motion ("CPM") machine for plaintiff to use six hours per day.

8  Dr. Shifflett had no idea whether CSP-Solano had a CPM machine, and Dr. Shifflett did not

9  believe that anyone from the prison called him to indicate they did not have a CPM machine.

10          17.  On January 31, 2007, defendant Rallos examined plaintiff's right knee and

11  ordered ice to be applied daily for five days.  (Dkt. No. 28 at 2.)

12          18.  On February 5, 2007, Dr. Rohrer examined plaintiff, and referred him to

13  physical therapy.  (Dkt. No. 29-1 at 7.)  On February 9, 2007, defendant Rohrer completed a

14  referral for plaintiff to receive physical therapy, and circled "routine."  (Dkt. No. 28-3 at 15.)[5]

15          19.  On February 20, 2007, plaintiff had an appointment with physical therapist

16  Robert Spriggs at CSP-Solano.  Spriggs' report of the consultation states that plaintiff

17  complained of an inability to fully extend his knee due to persistent edema.  (Dkt. No. 32 at 27.)

18  Spriggs' objective findings were:

19          STRENGTH - rt. knee 3-3+/5, others 4-5/5.
            ROM - right knee (-)5°-90°, others WFL
20          FUNCTION - ambulatory with crutches independently.

21  (Id.)  Spriggs' assessment stated:

22          [Plaintiff] understands he will need to limit his weight bearing
            RLE with the crutches until his edema is resolved.  He will need to
23          avoid closed-chained strengthening exercises also pending edema
            resolution.  [Plaintiff] understands also to avoid any rigorous
24

25          [5]  As noted in paragraph 26 below, the bottom of the February 9, 2007 referral form is
     signed by Spriggs, and notes that plaintiff consulted with Spriggs on April 3, 2007, and that
26   plaintiff should have a follow up within 6 "[illegible]."  (Dkt. No. 28-3 at 15.)

1    exercise pending clearance from his PCP [or] physical therapist.

2  (Id.) Spriggs set forth plaintiff's program as:  "Open-chained self-exercise instruction.

3  Positioning instruction to reduce edema and facilitate gravitational knee extension," and

4  identified the following goals:  "Patient to demonstrate sound technique/understanding of above

5  instruction.  (Completed today, patient denying any increase in his resting pain post-ex)."  (Id.)

6         Plaintiff contends that Spriggs handed plaintiff a sheet of paper for some back

7  exercises, not knee exercises, and that when plaintiff brought this fact to Spriggs' attention, the

8  therapist responded that plaintiff could do one of the exercises on the paper because the therapist

9  didn't have a knee paper.  (Dkt. No. 34-2 at 7-8.)  In his deposition, plaintiff stated Spriggs told

10  plaintiff that he really needs physical therapy with equipment, similar to what they have at CMF

11  with access to universal weight machines, leg exercise machines, and similar machines for

12  strengthening your leg, but that CSP-Solano doesn't have that equipment.  (Dkt. No. 34-2 at 8.)

13         20.  On February 26, 2007, defendant Rohrer saw plaintiff in the satellite clinic for

14  follow-up after knee surgery.  (Dkt. No. 29-1 at 10.)  Defendant Rohrer noted plaintiff had

15  moderate edema, and saw a physical therapist on February 20, 2007.  (Id.)  Defendant Rohrer

16  also signed a referral marked "routine" for plaintiff to have a follow-up appointment with Dr.

17  Shifflett.  (Dkt. No. 28-3 at 14.)  The bottom of the referral form provides a space for notes from

18  the appointment with Dr. Shifflett, and includes Dr. Shifflett's March 8, 2007 recommendation

19  that plaintiff "needs more aggressive P.T."  (Dkt. No. 28-3 at 14.)

20         21.  On March 8, 2007, Dr. Shifflett noted plaintiff "developed a lot of swelling in

21  the leg that has persisted whenever he is active to any extent," and plaintiff reported he was not

22  getting any physical therapy.  (Dkt. No. 27-9 at 26.)  Upon examination, Dr. Shifflett found

23         moderate to severe enlargement about the knee some of which is
           effusion, some is extraarticular.  The leg is somewhat swollen as
24         well below the knee.  The knee is tight in extension at minus 15
           degrees, flexion goes to 100 degrees.  There is slight medial laxity.
25         Gait is antalgic with the knee bent.

26  (Dkt. No. 27-9 at 26.)  Dr. Shifflett's impression was "status-post knee arthroplasty with residual

1    flexion contracture." (Id.)

2           22.  In Dr. Shifflett's first Forensic Clinic Report dated March 8, 2007, Dr.

3    Shifflett set forth the following plan for plaintiff:

4               The patient should have more aggressive physical therapy to gain
                extension now so that he does not require manipulation under
5               anesthesia and so that he has a better gait pattern for weight
                distribution across the prosthesis to prevent premature failure due
6               to loosening.  We will discuss with the medical staff at California
                State Prison Solano.  ¶  Return in 6 weeks with x-ray.
7

8    (Dkt. No. 27-9 at 26.)  In Dr. Shifflett's second Forensic Clinic Report dated March 8, 2007, and

9    signed on March 22, 2007, Dr. Shifflett set forth the following plan for plaintiff:

10              The patient should have more aggressive therapy and a more
                aggressive exercise program.  He needs to have better extension if
11              he is going to have a successful outcome both from the standpoint
                of gait energy expenditure and longevity of the prosthesis.  We will
12              call to review this with his primary care physicians.  (¶) Return in 6
                weeks with new x-ray.
13

14   (Dkt. No. 27-9 at 27.)  In his deposition, Dr. Shifflett confirmed that he stands by both notes from

15   March 8, 2007.[6]  (Dkt. No. 27-3 at 25.)

16          Although the March 8, 2007 notes indicate that Dr. Shifflett would discuss more

17   aggressive physical therapy with prison medical staff, Dr. Shifflett did not discuss this fact with

18   prison staff, and Dr. Shifflett did not know if his staff did so.  Dr. Shifflett also confirmed that no

19   one from the prison called Dr. Shifflett to inquire as to what he meant by "more aggressive

20   physical therapy," and most communication with the prison was through the office.  Dr. Shifflett

21   did not know whether plaintiff followed Dr. Kessler's home exercise program instructions, but

22   Dr. Shifflett testified that plaintiff indicated he was trying to do his exercises.

23          23.  On March 15, 2007, defendant Rallos noted plaintiff should be rescheduled in

24   three to four weeks.  (Dkt. No. 28-1 at 8.)  On March 19, 2007, plaintiff presented at clinic but

25   _____

26          [6]  For ease of reference, Dr. Shifflett's March 8, 2007 orders are hereafter referred to in
     the singular.

1   had to be rescheduled due to overbooking.  (Dkt. No. 28-1 at 7.)

2          24.  On March 20, 2007, defendant Dr. Rallos noted Dr. Shifflett's March 8, 2007

3   order for physical therapy, that plaintiff saw a prison physical therapist on February 20, 2007, and

4   that plaintiff was instructed on home exercises.  (Dkt. No. 28 at 3.)  Dr. Rallos examined

5   plaintiff, and noted that plaintiff's right knee was swollen, but there was no evidence of infection.

6   Plaintiff's flexion was 90 degrees, and the extension was almost full.  Defendant Rallos

7   instructed plaintiff to continue his physical therapy home exercises, and made a referral for

8   outside facility physical therapy.  (Dkt. No. 28 at 3; 28-1 at 8.)  The words "emergent, urgent or

9   routine" are not circled on the referral form.  (Dkt. No. 28-1 at 10.)  Dr. Rallos' handwritten

10  notes on the referral form state:  "saw Dr. Shifflett 3/8/07 =) more PT recommended" and "Pt

11  relates not getting enough PT here?"  (Dkt. No. 28-1 at 10.)  At this appointment, plaintiff also

12  complained of pain in his right breast for the past two weeks, and defendant Rallos diagnosed

13  and wrote a referral for a cystic breast mass.  (Dkt. No. 28-1 at 9.)

14          25.  On March 21, 2007, plaintiff filed an inmate appeal claiming that the CSP-

15  Solano medical department failed to provide a total comprehensive physical therapy program for

16  plaintiff.  (Dkt. No. 28-4 at 4.)  Plaintiff asserted he needed "real hands-on" physical therapy with

17  all the necessary equipment and guidance for complete rehabilitation.

18          26.  On April 3, 2007, physical therapist Spriggs consulted with plaintiff for

19  "status post right knee replacement."  (Dkt. No. 32 at 28.)  In plaintiff's history, Spriggs noted

20  that plaintiff:

21          had previous arthroscope on same knee in 2/05 with a
            meniscectomy and lateral capsular release.  Surgical report for the
22          TKR was extensive suggesting complicating factors.

23  (Id.)  Plaintiff reported having a cane for two years, and complained of "persistent edema with

24  inability to either extend or flex joint fully," and "of recent left hip pain."  (Id.)  Spriggs'

25  objective findings were:

26          STRENGTH - right knee 3-3+/5 (pain/edema limiting), others WFL.

11

ROM - right knee (-7°)-90°, others WFL
FUNCTION - ambulates with cane in proper (contralateral) hand
using two point gait pattern.
EDEMA - moderate residual right knee.

(Id.)  Spriggs' assessment was:

Patient with apparent complex total knee replacement with
persistent edema.  The limitation in AROM appears to be largely
the result of fluid retention.  Patient will need to adhere to a
consistent program of limb elevation which should help him
accelerate the fluid dissipation.  [Plaintiff] will also need to
participate with an open-chained strengthening program which he
will be instructed in today.  I would expect this patient to full[y]
recover if he does not succumb to overuse delays during the
recovery process.

(Id.)  Spriggs instructed plaintiff in open-chained strengthening self-exercise program, and proper

evaluation technique, and provided plaintiff sheets with illustrations of exercises.  (Id.)  Spriggs

noted goals were:  Edema reduction, restoration of 0-90° AROM as a minimum with 4/5

strength.  (Id.)  Spriggs signed the February 9, 2007 referral form, and noted plaintiff should

follow-up within "6 [illegible]."  (Dkt. No. 28-3 at 15.)

27.  Defendant Rallos responded to plaintiff's March 21, 2007 appeal at the

informal level on April 5, 2007, noting the February 20, 2007 physical therapy consultation with

Spriggs.  Defendant Rallos noted that plaintiff was given instructions on how to do exercises, and

that defendant Rallos had given plaintiff a referral for outside physical therapy.

On March 30, 2007, defendant Rallos wrote plaintiff a five day lay-in (dkt. no. 28-

01 at 11), and on April 2, 2007, a seven day lay-in (dkt. no. 28-1 at 12).

28.  On April 10, 2007, plaintiff appealed defendant Rallos' response to the first

formal level, noting Dr. Shifflett ordered "aggressive physical therapy" on March 8, 2007, and

plaintiff had not been given physical therapy.  (Dkt. No. 28-4 at 4; 28-3 at 2.)

29.  On May 1, 2007, plaintiff had another appointment with Spriggs, but plaintiff

showed up, then left.  (Dkt. No. 32 at 29.)

30.  On May 10, 2007, defendant Mahon-Howe made a referral for outside

12

physical therapy and noted that a referral for outside physical therapy had been pending since March 20, 2007. Defendant Mahon-Howe submitted another referral, and "routine" is circled on the May 10, 2007 referral form. (Dkt. No. 28-3 at 12.) Mahon-Howe set forth the medical necessity as:

> 51 y/o.  Knee replacement.  Unable to fully extend knee. . . .
> Aggressive outside P.T. recommended.  First request for outside
> P.T. 3-20-07.

(Dkt. No. 28-10 at 2.)  On the bottom of the form, a future PT appointment at QVH is noted for "06/22/07 at 1400."  (Id.)

31.  On May 15, 2007, plaintiff last saw Spriggs.  Plaintiff was still having moderate edema around the right knee, and reported that plaintiff was performing the exercises that he had been given "as best as possible, however the edema is acting as a major deterrent to return of normal function."  (Dkt. No. 32 at 30.)  Spriggs noted that plaintiff should be given ice and short term NSAID treatment until the edema problem "is better controlled."  (Id.)

32.  Defendant Rohrer interviewed plaintiff on May 17, 2007, concerning his first formal level appeal.  (Dkt. No. 28-4 at 4.)  In connection with the appeal, on May 15, 2007, Dr. Rohrer made a referral for plaintiff to see an outside physical therapist.[7]  (Dkt. No. 19 at 4.)  In addition, defendant Rohrer charted the following on May 16, 2007:  "Please fax orthopedic note from 3/8/07 and physical therapy referrals 5/10/07 and March 20, 2007 to ext 3202."  (Dkt. No. 29-1 at 12.)  Defendant Rohrer also noted that plaintiff saw the prison physical therapist on February 20, 2007, and April 3, 2007.

33.  A. Noriega, M.D., provided the formal response to plaintiff's first level appeal.  (Dkt. No. 28-6 at 11-12.)  Dr. Noriega noted that plaintiff had been referred to an outside physical therapist, and that "our schedulers have been contacted to expedite this referral."  (Dkt. No. 28-6 at 11.)  Attachments to the first level response included four physician requests for

---

[7]  A copy of the May 15, 2007 referral form was not provided by defendant Rohrer (dkt. no. 29, *passim*), so the court cannot determine whether it was marked routine or urgent.

1    services, one for outside physical therapy services signed by defendant Rallos on March 20,

2    2007, two signed by defendant Rohrer for an appointment to Dr. Shifflett for a post-operative

3    follow-up, one for in-house physical therapy, and one signed by defendant Mahon-Howe on May

4    10, 2007, also requesting treatment by an outside physical therapist.  (Dkt. No. 28-4 at 5.)

5            34.  On May 30, 2007, plaintiff filed a second level appeal, which defendant

6    Traquina received on June 5, 2007, and defendant Traquina responded to on June 15, 2007.

7    (Dkt. No. 28-4 at 5.)  Although defendant Traquina noted the March 8, 2007 order by Dr.

8    Shifflett recommending aggressive physical therapy, defendant Traquina informed plaintiff that it

9    was inappropriate for plaintiff to expect a physical therapist to implement plaintiff's preferred

10   type of therapy.  Defendant Traquina reiterated that plaintiff had been seen by the prison physical

11   therapist Spriggs on February 20, 2007, and plaintiff had been given instructions on increasing

12   range of motion, which the therapist believed was appropriate.  Defendant Traquina also noted,

13   however, that on April 20, 2007, plaintiff was referred to an outside facility for physical therapy.

14   (Id.)  Because plaintiff's request for outside physical therapy was approved, defendant Traquina

15   granted the appeal.  (Id.)  Defendant Traquina did not expedite the request for physical therapy.

16           35.  On May 31, 2007, defendant Mahon-Howe saw plaintiff and noted right knee

17   swelling, and that plaintiff did not have full flexion or full extension.  (Dkt. No 28-8 at 4.)

18   Defendant Mahon-Howe noted that plaintiff was referred to an outside physical therapist, but that

19   they were waiting for the therapist to call and schedule an appointment.  (Id.)  Defendant Mahon-

20   Howe noted plaintiff's right knee x-ray was to go with plaintiff to his orthopedic appointment

21   with Dr. Shifflett.  (Id.)  Defendant Mahon-Howe ordered ice for plaintiff's knee and reviewed

22   with him his exercise program provided by the prison therapist.  (Id.)

23           36.  On June 8, 2007, defendant Mahon-Howe ordered an x-ray of plaintiff's right

24   knee.  (Dkt. No. 28-8 at 4.)  Plaintiff's knee was x-rayed on June 8, 2007. (Dkt. No. 28-10 at 10.)

25           37.  The radiology report, dictated on June 16, 2007, by F. Ronald Hetrick, M.D.,

26   radiologist, stated:

FINDINGS:  There is a total knee replacement present.  There is a wide interface with slight sclerotic line on the tibial component separating from the component and loosening is suspected.  (¶)  On the femoral side of the joint, no definite loosening is noted.  There is an osteophyte present posteriorly.

IMPRESSION:

1.  Findings suspicious for loosening of the tibial component.  A bone scan may be helpful if indicated.

(Dkt. No. 28-10 at 10.)  On the bottom of the report, defendant Mahon-Howe noted she made a referral on July 17, 2007.  (Id.)

38.  On June 26, 2007, defendant Mahon-Howe ordered plaintiff's chart pulled with attached x-ray, and noted the "ortho referral (form sent)."  (Dkt. No. 28-10 at 12.)  On June 26, 2007, defendant Mahon-Howe ordered a referral to Dr. Shifflett for plaintiff, and circled "routine."  (Dkt No. 28-8 at 4; 28-10 at 13.)

39.  On July 2, 2007, plaintiff appealed to the third level stating plaintiff had not actually had the physical therapy appointment which was to be scheduled.  (Dkt. No 28-4 at 5.)

40.  On July 6, 2007, defendant Mahon-Howe filled out a QVH form for physical therapy for plaintiff for four to six visits within four weeks.  (Dkt. No. 28-8 at 4.)  Defendant Mahon-Howe marked "evaluation" as the treatment plan, and "increased functional status" and "indep. home program" as the long term treatment goals.  (Dkt. No. 28-10 at 14.)  Defendant Mahon-Howe declared "this form had been sent by QVH on July 9th for an update."  (Dkt. No. 28-8 at 4.)

41.  Plaintiff was seen by a physical therapist at QVH on July 6, 2007, and was again given a home exercise program.  (Dkt. No. 28-4 at 5; 28-8 at 4.)  It does not appear either party provided a copy of the therapist's report for this visit.

42.  Defendant Mahon-Howe stated that plaintiff had other physical therapy appointments scheduled at QVH for September 10 and October 20, 2007.  (Dkt. No. 28-8 at 4.)

43.  On September 17, 2007, Andrew J. Nicks, M.D., dictated a report from

15

1   plaintiff's nuclear bone scan performed for "possible loosening of tibial prosthesis component."

2   (Dkt. No. 27-8 at 11.)  Dr. Nicks concluded:

3               Positive radionuclide accumulation is noted about the right knee
            prosthesis.  This is of equivocal significance since a bone scan can
4           be positive at least up to a year following surgery and/or fracture.  ¶
            Focal nonspecific area of increased radionuclide activity is noted in
5           the left mid shaft femur.  Correlation with follow-up imaging and
            possibly MRI may be helpful.  This could represent a focal lesion
6           or a metastasis.  Correlation with Indium white cell imaging may
            be helpful.

7

8   (Dkt. No. 27-8 at 11-12.)

9               44.  On October 5, 2007, the Chief of the Inmate Appeals Branch responded to

10  plaintiff's third level appeal, indicating that plaintiff had been put on a waiting list for an outside

11  physical therapist.

12              45.  Defendant Mahon-Howe stated that on October 5, 2007, she ordered that

13  plaintiff be referred to QVH for physical therapy on an urgent basis.  (Dkt. No. 28-8 at 4; 28-10

14  at 15.)  An RN noted an appointment was scheduled for October 9, 2007, at 1630.  (Dkt. No. 28-

15  10 at 15.)

16              46.  On October 9, 2007, defendant Mahon-Howe prepared a progress note

17  indicating that plaintiff had a physical therapy appointment at QVH but QVH canceled it.  (Dkt.

18  No. 28-10 at 16.)  Defendant Mahon-Howe stated she received this information from the

19  scheduler.  (Dkt. No. 28-8 at 5.)  After review of plaintiff's chart, however, defendant Mahon-

20  Howe found no evidence that medical staff had canceled any physical therapy appointments.

21  (Id.)  Mahon-Howe does not know who canceled the appointment or why it was canceled.[8]  On

22  October 9, 2007, defendant Mahon-Howe filled out a Physician Request for Services on an

23  urgent basis for physical therapy at QVH for plaintiff.  (Id.)  "URGENT" is circled, and the word

24  "URGENT" in half-inch sized letters is stamped, on the referral form.  (Dkt. No. 28-10 at 17.)

25  ────────────────

26          [8]  Defendant Mahone-Howe noted that "[o]n occasion, custody staff would cancel an
    inmate's appointment for security reasons and medical staff would not be informed."  (Id.)

1    47.  On October 18, 2007, plaintiff presented at the "MD Line" complaining of

2    problems with his prosthetic knee and noted he was "still waiting [follow-up with] Shifflett due

3    late 4/07." (Dkt. No. 28-10 at 16.)  An RN noted that the "MD Line" appointment was

4    rescheduled due to "inavail."  (Id.)

5    48.  On October 18, 2007, Dr. Hseuh completed a referral for plaintiff's follow-up

6    appointment with Dr. Shifflett.  (Dkt. No. 27-8 at 10.)  Dr. Hseuh noted that plaintiff was seen by

7    Dr. Shifflett on March 8, 2007, and "was supposed to follow up with ortho in six weeks.

8    Appointment past due." (Id.)  Dr. Hseuh did not circle emergent, urgent or routine, but wrote

9    (ASAP) by those terms, and included (ASAP) in the requested services box.  (Id.)

10    Dr. Hseuh's request was faxed to Renee at QVH on October 29, 2007, with a

11    cover memo marked "ASAP," and was re-faxed on November 26, 2007.  (Dkt. No. 27-8 at 9.)

12    49.  On November 16, 2007, defendant Rallos made a referral for plaintiff to be

13    seen by the prison physical therapist and asked that it be expedited.  (Dkt. No. 28 at 3-4; 28-1 at

14    13.)

15    50.  On January 14, 2008, the physical therapist at QVH noted plaintiff had not

16    returned for physical therapy.  (Dkt. No. 28-4 at 5.)

17    51.  On January 18, 2008, plaintiff received his follow-up appointment with Dr.

18    Shifflett, initially ordered on March 8, 2007.  Dr. Shifflett examined plaintiff and noted that

19    plaintiff walked with a significant limp on the right side.  (Dkt. No. 27-8 at 8.)  Dr. Shifflett

20    compared plaintiff's x-rays from surgery in January 2007, with the recent x-ray, and noted that

21    "the x-rays show changes that are of concern.  It may well represent aseptic or septic loosening."

22    (Dkt. No. 27-8 at 7.)  Dr. Shifflett ordered further work-up, including an Indium white cell scan

23    and lab work, and plaintiff should return for reevaluation with those test results.  (Id.)  Dr.

24    Shifflett stated that "[i]t is likely that he has loosening and that he will require revision probably

25    of both components."  (Id.)

26    52.  On January 23, 2008, Renee sent a copy of Dr. Shifflett's recommendation for

17

1  an Indium white cell scan and lab work, and asked to be advised when the testing was complete

2  so she could schedule a follow-up appointment.  (Dkt. No. 27-8 at 6.)

3         53.  On January 28, 2008, plaintiff presented at the medical line, and defendant

4  Rohrer noted "referral for follow-up with bone tumor," and "orthopedic follow-up with Dr.

5  Shifflett pending from January 24, 2008."  (Dkt. No. 29-1 at 14.)  Defendant Rohrer diagnosed

6  plaintiff with a bone-infiltrative process in plaintiff's left femur, and ordered follow-up with a

7  bone tumor specialist for possible core biopsy.  (Id.)

8         54.  On March 18, 2008, defendant Rallos approved the referral of another

9  physician for plaintiff to see Dr. Shifflett at QVH for an evaluation of plaintiff's right knee.

10  (Dkt. No. 28 at 4.)  This referral was marked routine.  (Id.)

11         55.  On March 20, 2008, an outpatient scheduling form was faxed to CSP-Solano

12  from QVH, setting plaintiff's March 25, 2008 follow-up appointment with Dr. Shifflett.  (Dkt.

13  No. 27-8 at 5.)

14         56.  On March 25, 2008, Dr. Shifflett saw plaintiff, and noted plaintiff was

15  awaiting an Indium Scan.  (Dkt. No. 27-8 at 2-3.)  Plaintiff noted plaintiff's pain was "becoming

16  more constant with aching and throbbing," and "aggravated by weight bearing."  (Dkt. No. 27-8

17  at 2.)  Dr. Shifflett reviewed x-rays and noted they show "signs of loosening, especially on the

18  medial side involving the tibial prosthesis."  (Id.)  Dr. Shifflett stated plaintiff needed an Indium

19  Scan to complement the prior bone scan, and to determine whether an immediate revision could

20  be done, or whether a staged revision was required to allow treatment of an infection.  (Id.)  Dr.

21  Shifflett requested an Indium Scan "on an urgent basis to plan for ultimate care of this painful

22  knee."  (Id.)

23         57.  On April 22, 2008, Renee faxed a request for authorization for plaintiff to

24  receive an Indium scan to evaluate for infection before plaintiff's right knee revision.  (Dkt. No.

25  27-8 at 4.)  The form was re-faxed on June 5, 2008, and noted received on June 10.  (Id.)

26         58.  On July 9, 2009, defendant Rohrer ordered plaintiff referred to orthopedics.

(Dkt. No. 29-1 at 19.)

59.  On June 23, 2010, Dr. Shifflett performed a revision of plaintiff's right knee because plaintiff was having persistent knee pain.  In his deposition, Dr. Shifflett testified that prior to the second surgery, he opined that plaintiff's pain was caused by "microscopic noninfectious loosening" of the prosthesis placed in the January 2007 surgery.  (Dkt. No. 27-3 at 13.)  Dr. Shifflett testified that he did not find any instability with plaintiff's right knee before the revision surgery.  (Dkt. No. 27-3 at 19.)  Although instability could be indicative of a progressive loosening, "it would not be likely as a sign of loosening unless it were grossly loose."  (Id.)

60.  Dr. Shifflett, while treating plaintiff, did not form the opinion that it was more probable than not that the microscopic loosening was related to physical therapy issues.  (Dkt. No. 27-3 at 19.)  However, Dr. Greenfield, plaintiff's expert, opined that to a reasonable degree of medical probability, the failure to provide plaintiff actual hands on physical therapy sessions several times a week following the March 2007 visit with Dr. Shifflett was a cause of the failure of plaintiff's first right knee replacement.  (Dkt. No. 37 at 3.)  Dr. Shifflett has no opinion as to why there was a loosening following the January 2007 surgery, and cannot say whether the microscopic loosening was related to insufficient physical therapy after the January 2007 surgery.

61.  It is undisputed that there are a number of reasons, other than a lack of physical therapy, which could cause a failure to achieve full extension of the knee.  (Dkt. No. 27-3 at 31-32.)  However, Dr. Shifflett testified that a lack of physical therapy could be one reason plaintiff couldn't gain full extension when plaintiff presented in March of 2007.  (Dkt. No. 27-3 at 21-22.)  It is undisputed that Dr. Shifflett ordered "more aggressive" physical therapy for plaintiff on March 8, 2007, because he wanted plaintiff to gain his extension so that his gait pattern would be better.  (Dkt. No. 27-3 at 31-32.)

62.  In his operation report, Dr. Shifflett set forth the preoperative and postoperative diagnoses as "failed right total knee arthroplasty."  (Dkt. No. 27-4 at 18.)

63.  Dr. Shifflett ruled out plaintiff's sarcoidosis and Hepatitis C as causes of

1   plaintiff's right knee pain after the first arthroplasty.  (Shifflett Dep. at 26-27.)

2        64.  Plaintiff has no complaints about physical therapy provided after the 2010

3   surgery.  Plaintiff is still complaining of right knee pain, and Dr. Shifflett has no opinion as to the

4   cause of that pain, although one possible cause is loosening.  (Dkt. No. 27-3 at 15, 29.)

5        65.  It is undisputed that none of the defendants can actually schedule an

6   appointment for a patient.  Defendants contend that when physicians wish to obtain outside

7   treatment for an inmate, they can only submit written requests for referrals for an inmate to be

8   scheduled an appointment, and that the prison's utility management schedulers are responsible

9   for acquiring appointments with outside providers and scheduling those appointments.

10  Defendant Traquina avers that an appointment for outside treatment is primarily dependent on

11  the availability of the outside provider.  Plaintiff contends that these medical professionals were

12  required to do more to ensure plaintiff received the "more aggressive" physical therapy Dr.

13  Shifflett ordered.

14       66.  Approved appointments are scheduled by the prison schedulers in conjunction

15  with the outside providers, who must have a contract with CSP-Solano.

16  V.  Eighth Amendment Claim

17       A.  Legal Standard

18       The unnecessary and wanton infliction of pain constitutes cruel and unusual

19  punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

20  Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

21  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

22  that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

23  acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

24  Seiter, 501 U.S. 294, 298-99 (1991).

25       Where a prisoner's Eighth Amendment claims arise in the context of medical

26  care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

1  deliberate indifference to serious medical needs." <u>Estelle</u>, 429 U.S. at 106.  An Eighth

2  Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

3  and the nature of the defendant's response to that need."  <u>McGuckin v. Smith</u>, 974 F.2d 1050,

4  1059 (9th Cir. 1991), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133

5  (9th Cir. 1997) (en banc).

6          A medical need is serious "if the failure to treat the prisoner's condition could

7  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

8  <u>McGuckin</u>, 974 F.2d at 1059 (quoting <u>Estelle</u>, 429 U.S. at 104).  Indications of a serious medical

9  need include "the presence of a medical condition that significantly affects an individual's daily

10  activities."  <u>Id.</u> at 1059-60.  By establishing the existence of a serious medical need, a prisoner

11  satisfies the objective requirement for proving an Eighth Amendment violation.  <u>Farmer v.</u>

12  <u>Brennan</u>, 511 U.S. 825, 834 (1994).

13          If a prisoner establishes the existence of a serious medical need, he must then

14  show that prison officials responded to the serious medical need with deliberate indifference.

15  <u>Farmer</u>, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

16  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

17  which prison officials provide medical care.  <u>Hutchinson v. United States</u>, 838 F.2d 390, 393-94

18  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

19  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

20  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

21  <u>Broughton v. Cutter Laboratories</u>, 622 F.2d 458, 460 (9th Cir. 1980) (citing <u>Estelle</u>, 429 U.S. at

22  105-06).  Deliberate indifference is "a state of mind more blameworthy than negligence" and

23  "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  <u>Farmer</u>,

24  511 U.S. at 835 (quoting <u>Whitley</u>, 475 U.S. at 319).

25          Delays in providing medical care may manifest deliberate indifference.  <u>Estelle</u>,

26  429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).[9]  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.  Also, "[d]eliberate indifference may be found where prison officials fail to provide an inmate with medical care for reasons unrelated to the medical needs of the prisoner, such as administrative concerns." Oliver v. Carey, 315 Fed. Appx. 649 (9th Cir. 2009) (citing Jett, 439 F.3d at 1097) (In Oliver, the plaintiff alleged that defendant doctors were deliberately indifferent when they denied his grievance appeal based on an eight to ten month delay for orthopedic services, and because "the scheduling of contract providers was beyond the authority of CSP staff.")

Moreover, a prison official who ignores a treating physician's instructions may act in deliberate indifference.  See Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[A] prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.")  A prison official who interferes with the instructions of a physician may be liable for an Eighth Amendment violation.  See Hamilton v. Edell, 981 F.2d 1062, 1066-67 (9th Cir. 1992) (prison officials' decision to force inmate to fly in

---

[9]  In Ortiz, the Ninth Circuit reversed summary judgment where medical staff and doctor knew that the pretrial detainee had a head injury, but prescribed contraindicated medications, disregarding evidence of complications to which the defendants had been specifically alerted by the private treating physician.  Id.

1   contravention of treating physician's specific orders could constitute deliberate indifference to

2   inmate's medical needs), overruled in part on other grounds, Saucier v Katz, 533 U.S. 194

3   (2001).

4          Finally, mere differences of opinion concerning the appropriate treatment cannot

5   be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

6   1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

7          B.  Initial Observations

8          Several initial observations are warranted.  As the undersigned noted at the

9   hearing, the instant case presents a close question because it is the unusual case where a delay in

10  medical treatment constitutes deliberate indifference.  Defendants contend that while in hindsight

11  plaintiff may not have received all the physical therapy he was due, plaintiff received myriad

12  medical services, including some physical therapy, and defendants Rallos, Rohrer and Mahon-

13  Wade each wrote referrals for plaintiff to receive outside physical therapy.  Thus, defendants

14  argue, any failure to provide "more aggressive" physical therapy was not deliberate indifference,

15  or was merely negligent.  In addition, defendants point out the challenges of providing medical

16  services in prison; how it is difficult to recruit physical therapists to work in a prison setting, and

17  how the process of obtaining outside referrals requires doctors to complete referral forms, but it

18  is up to schedulers to make appointments which are subject both to the availability of a contract

19  provider, as well as the schedule of the specialist sought.  Therefore, defendants argue, any

20  failure to provide more aggressive physical therapy was beyond defendant physicians' control.

21         It is true that inmates are not entitled to premier medical treatment, and prisons

22  are not required to provide medical services that meet or exceed those services available to the

23  outside population with insurance coverage.  Indeed, the deliberate indifference standard requires

24  a more culpable state of mind than negligence.  That said, however, it is also true that inmates are

25  at the mercy of the medical providers in prison, and prisons must therefore provide a level of

26  medical treatment that passes constitutional muster.  See Brown v. Plata, 131 S. Ct. 1910 (2011)

1   (class action attributing the California prison system's inability to deliver constitutionally

2   adequate medical treatment and care to overcrowding conditions).

3              Moreover, if medical professionals in prison choose to provide inmates with joint

4   replacement surgery, these medical professionals must be prepared to adequately address

5   complications.  Even if physical therapy is not required following knee replacement surgery,

6   plaintiff's situation was different.  Plaintiff presented with swelling and pain, and at least one

7   radiologist and plaintiff's treating orthopedic surgeon believed plaintiff might be suffering

8   loosening of the prosthetic.  Therefore, even if providing a patient with physical therapy that

9   primarily consists of home exercise instructions is sufficient for an ordinary knee replacement

10  patient, once plaintiff presented with complicating symptoms, and the treating surgeon ordered

11  plaintiff to receive "more aggressive" physical therapy because of risks that were specifically

12  included in that order, adhering to a normal practice of routine referrals rather than addressing

13  plaintiff's complications and ensuring compliance with a specific order from the treating surgeon

14  raises an inference of deliberate indifference.  Here, plaintiff was experiencing complications and

15  needed "more aggressive" physical therapy.  Plaintiff's expert, and even defendants,

16  acknowledge that physical therapy is needed after a knee replacement, and that lack of physical

17  therapy can lead to loosening, and potential loss of the knee prosthetic.  Here, despite plaintiff's

18  complaints of pain and swelling, and possible loosening, plaintiff did not receive his second knee

19  replacement surgery for over three years.

20             Therefore, the significant factors in this court's analysis were:  (1) Dr. Shifflett's

21  March 8, 2007 order; (2) the failure of plaintiff's treating physicians and physicians addressing

22  administrative appeals, to take steps to ensure plaintiff received "more aggressive" physical

23  therapy as ordered by the treating surgeon; and  (3) in light of plaintiff's swelling, pain, and

24  complaints of loosening, the prolonged delay in (a) receipt of physical therapy and follow-up

25  appointment, and (b) the three year delay in providing the second replacement surgery.  Viewing

26  the evidence in the light most favorable to plaintiff, these factors support inferences that certain

defendants' failure to ensure plaintiff received "more aggressive" physical therapy and his follow

up appointment with Dr. Shifflett rise to the level of deliberate indifference to plaintiff's serious

medical needs.

However, as set forth more fully below, a jury must determine whether each

defendant's alleged failure to ensure that plaintiff received "more aggressive" physical therapy

rises to the level of deliberate indifference. As discussed during the hearing, this is a higher

standard than negligence or medical malpractice. At trial, plaintiff must demonstrate that each

defendant failed to act despite knowledge that his or her conduct created a substantial risk of

harm to plaintiff, see Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (requiring "a purposeful

act or failure to respond to a prisoner's pain or possible medical need").

C. Analysis

With these considerations in mind, the court turns to the elements of plaintiff's

claim, then to plaintiff's claims against defendants, first individually, then as to the overall care

provided for plaintiff.

1. Serious Medical Need

Defendants do not appear to dispute that plaintiff's medical need was serious. A

prisoner has a serious medical need if the failure to treat the condition could result in further

significant injury or the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at

1059. Plaintiff's knee replacement surgery and his subsequent complications related thereto

presented a serious medical need.

2. Deliberate Indifference

The second prong of the deliberate indifference analysis requires both "(a) a

purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

caused by the indifference." Jett, 439 F.3d at 1096. Deliberate indifference thus requires an

objective risk of harm and a subjective awareness of that harm. Farmer, 511 U.S. at 837.

////

a.  Objective Risk of Harm

Here, the objective risks of harm that could result from the failure to provide "more aggressive" physical therapy were provided in Dr. Shifflett's March 8, 2007 report.  (Dkt. No. 27-9 at 26.)  Specifically, one risk was "to avoid manipulation under anesthesia."  In other words, the failure to provide "more aggressive" physical therapy could so impact the knee joint that the patient would require surgery to allow the doctor to manipulate the joint under anesthesia.  Viewed in the light most favorable to plaintiff, this risk raises an inference that a lack of physical therapy would affect plaintiff's flexion or extension, and the record reflects plaintiff's flexion and extension were reduced.

A second risk was premature failure due to loosening.  The June 16, 2007, radiologist's report noted "findings suspicious for loosening."  (Dkt. No. 28-10 at 10.)  On September 17, 2007, the nuclear bone scan report noted "possible loosening."  (Dkt. No. 27-8 at 11-12.)  Also, on January 18, 2008, Dr. Shifflett thought plaintiff's knee replacement may have loosening.  By March 25, 2008, plaintiff complained his right knee was aching and throbbing.  Despite these suggestions that plaintiff was experiencing loosening, plaintiff did not receive his second knee replacement surgery for three more years.  Viewing this evidence in the light most favorable to plaintiff, this further delay supports an inference that certain defendants were deliberately indifferent to plaintiff's pain and other symptoms he experienced during this prolonged period.

A third risk related to plaintiff's gait.  Dr. Shifflett's order appears to suggest that "more aggressive" physical therapy improves gait pattern for weight distribution.  Viewed in the light most favorable to plaintiff, this risk raises an inference that the failure to provide the "more aggressive" physical therapy caused or contributed to an injury to plaintiff's opposite hip due to

////

////

////

1  his crippling walk, which allegedly causes plaintiff constant pain.[10]

2                    b.  Response to the Risk of Harm:  Alleged Failure to Act

3          This second prong -- defendant's response to the need was
           deliberately indifferent -- is satisfied by showing (a) a purposeful
4          act or failure to respond to a prisoner's pain or possible medical
           need. . . .  Indifference "may appear when prison officials deny,
5          delay or intentionally interfere with medical treatment, or it may be
           shown by the way in which prison physicians provide medical
6          care."  Id. at 1059 (quoting Hutchinson v. United States, 838 F.2d
           390, 392 (9th Cir.1988)).  Yet, an "inadvertent [or negligent]
7          failure to provide adequate medical care" alone does not state a
           claim under § 1983.  Id. (citing Estelle, 429 U.S. at 105, 97 S. Ct.
8          285).

9  Jett, 439 F.3d at 1096.  "Whether [an] official had the requisite knowledge of a substantial risk is

10 a question of fact subject to demonstration in the usual ways, including inference from

11 circumstantial evidence."  Farmer, 511 U.S. at 842.  Indeed, in certain circumstances, "a

12 factfinder may conclude that [an] official knew of a substantial risk from the very fact that the

13 risk was obvious."  Id. (internal quotations omitted).

14         Initially, it seems common knowledge that if you have a knee joint replaced,

15 physical therapy is important.  Unlike other medical ailments where the benefits of physical

16 therapy may be equivocal, or where physical therapy may simply improve a patient's quality of

17 life, replacement of a knee joint, critical to a person's mobility, would require some level of

18 physical therapy.  This would seem to be particularly true where the pain resulting from the

19 surgery may impact a patient's ability to successfully perform exercises on his own.  Arguably,

20 therefore, a risk of harm from a failure to provide physical therapy after knee replacement surgery

21 may be obvious.

22         Here, however, when plaintiff returned for his follow-up appointment with Dr.

23 _____

24     [10]  These inferences are further supported by Dr. Shifflett's deposition testimony that
    when plaintiff reported he was not getting any physical therapy, Dr. Shifflett was concerned that
    plaintiff "was getting stiffer and was not able to maintain his motion on his own and that he
25 needed more help," which "could lead to a bad outcome defined either as a bad gait pattern, pain
    or potentially failure of the prosthesis, i.e., which is usually due to loosening."  (Shifflett Dep. at
26 38-39.)

                                             27

1    Shifflett, he presented "worse than before," and the treating orthopedic surgeon found that

2    plaintiff required "more aggressive" physical therapy, and set forth the risks in his report.  In this

3    court's view, those two facts distinguish this case from the ordinary Eighth Amendment

4    challenge to prison medical care.  Thus, if plaintiff demonstrates that each defendant was

5    subjectively aware of Dr. Shifflett's March 8, 2007 order, yet took no steps to ensure compliance

6    with that order, in deliberate indifference, plaintiff establishes a triable issue of fact precluding

7    entry of summary judgment.  Accordingly, the court will next analyze each individual

8    defendant's role.

9                                c. Traquina's Role in Administrative Appeals

10           Defendant Traquina contends he cannot be personally liable for a constitutional

11   violation because his only involvement was to review an appeal and grant it because the relief

12   plaintiff sought had been obtained through a referral to outside therapy.

13           The record shows that plaintiff was in need of ongoing physical therapy for his

14   right knee, rather than simply pursuing his administrative appeals to satisfy the exhaustion

15   requirements of 42 U.S.C. § 1997e(a).

16              [This] distinction is important because an appeals coordinator
             does not cause or contribute to a completed constitutional violation
17           that occurs in the past.  See George v. Smith, 507 F.3d 605,
             609-610 (7th Cir. 2007) ("[a] guard who stands and watches while
18           another guard beats a prisoner violates the Constitution; a guard
             who rejects an administrative complaint about a completed act of
19           misconduct does not").  However, if there is an ongoing
             constitutional violation and the appeals coordinator had the
20           authority and opportunity to prevent the ongoing violation, a
             plaintiff may be able to establish liability by alleging that the
21           appeals coordinator knew about an impending violation and failed
             to prevent it.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.
22           1989) (supervisory official liable under Section 1983 if he or she
             knew of a violation and failed to act to prevent it).

23

24   Herrera v. Hall, 2010 WL 2791586, at * 4 (E.D. Cal. 2010).

25           Defendant Traquina became aware of Dr. Shifflett's order on June 5, 2007, while

26   addressing plaintiff's second level administrative appeal, which included plaintiff's and Dr.

1    Rallos' reference to Dr. Shifflett's March 8, 2007 order.  Although defendant Traquina was not

2    in charge of hiring physical therapists, he stated he attempted to obtain more physical therapists,

3    but it "was difficult to find people to do therapy on inmates."  (Dkt. No. 28-4 at 2.)  By the end of

4    2008, CSP-Solano had a physical therapist who came in five days a week.  (Id.)

5            This court finds that the appeal response issued by defendant Traquina on June 15,

6    2007, raises a triable issue of material fact as to whether plaintiff suffered a continuing violation

7    of plaintiff's Eighth Amendment right to receive physical therapy for his right knee.  If plaintiff

8    was unable to obtain physical therapy by seeing prison health care providers, his sole avenue of

9    relief was to submit an inmate appeal.  Arguably, if defendant Traquina reviewed plaintiff's

10   medical file in connection with plaintiff's appeal, defendant Traquina should have noted the

11   limited amount of physical therapy provided to plaintiff after his knee replacement surgery, as

12   well as the failure to provide "more aggressive" physical therapy as ordered on March 8, 2007.

13           Despite defendant Traquina's arguments to the contrary, the Ninth Circuit has

14   made clear that Dr. Traquina cannot obtain summary judgment simply by filing a declaration

15   "generally disclaim[ing] personal responsibility" for an inmate's care.  Johnson v.

16   Schwarzenegger, 366 Fed. Appx 767, 769 (9th Cir. 2010) ("As a prisoner, [Johnson] was not at

17   liberty to turn to just anyone for medical care.  Presumably someone within the prison was

18   responsible for ensuring that a prisoner transferred to CSP Solano from another prison would

19   continue to receive necessary medications prescribed at the previous facility.  In the absence of

20   any other identified person, it is appropriate for [Johnson] to look to the chief medical officer.")

21           Moreover, in defendant Traquina's June 15, 2007 second level appeal response,

22   despite Dr. Shifflett's March 8, 2007 order, defendant Traquina stated:  "It is inappropriate for

23   [plaintiff] to expect a physical therapist to implement [plaintiff's] preferred type of therapy."

24   Defendant Traquina's statement raises a reasonable inference that defendant Traquina was

25   deliberately indifferent to the orthopedic surgeon's finding that plaintiff required "more

26   aggressive" physical therapy to obtain more extension and to avoid the failure of the prosthesis.

Finally, at deposition, defendant Traquina testified that:

1.     Between 2002 to 2008 it was difficult to get physical therapy coverage for inmates at CSP-Solano.  (Id. at 24.)

2.     It was not until 2008 that CSP-Solano was able to hire a physical therapist who would come to the prison five days a week.  (Id. at 29.)

3.     He asked the health administrator to hire more physical therapists on countless occasions.  (Id. at 30-31.)

4.     He confirmed that the delays in providing physical therapy as well as their frustration with those delays were discussed with his medical staff.  (Id. at 38.)

5.     It was difficult to send inmates to QVH for therapy because scheduling was subject to QVH's availability.  (Id. at 52.)

6.     The frequency of hip and knee replacements gradually increased between 2003 and 2008, but estimated there would have been less than ten knee replacements performed during that time frame.  (Id. at 27.)

7.     In addition to scheduling delays, there were transportation delays based on bus availability, because transport to court took priority over routine medical transports.  (Id. at 59-60.)

Dr. Traquina's testimony demonstrates that he was aware of the general difficulties in providing physical therapy to prisoners at CSP-Solano, and raises an inference that, once he became aware of Dr. Shifflett's specific order, more steps were required to comply with Dr. Shifflett's order rather than to simply grant plaintiff's administrative appeal.  A manager's continued reliance on processes that he knows are defective is evidence of deliberate indifference.  See Chacoan v. Rohrer, 2009 WL 1393076, at *11 (E.D. Cal. May 14, 2009) (Dr. Traquina cannot blame a faulty computer system for his failure to monitor and prevent prisoner's

////

delayed treatment.)[11]  Defendant Traquina's statements evidence his awareness of the difficulties associated with providing physical therapy to inmates, which raises a triable issue of material fact as to whether defendant Traquina should have done more than simply grant plaintiff's administrative appeal.

By June 15, 2007, viewing the evidence in the light most favorable to plaintiff, it is reasonable to infer that plaintiff had not received "more aggressive" physical therapy, and was not returned to Dr. Shifflett for follow-up within six weeks with a new x-ray.  Over three months had passed since Dr. Shifflett wrote his order.  Despite this three month delay, it is undisputed that defendant Traquina did not expedite the April 20, 2007 referral to an outside facility for physical therapy, or write a referral for plaintiff to be returned to Dr. Shifflett for follow-up. Defendant Traquina's knowledge of the difficulties in providing physical therapy to prisoners, as well as the delay experienced by plaintiff, give rise to an inference that defendant Traquina was deliberately indifferent to plaintiff's serious medical needs.  Thus, whether or not defendant Traquina, as Chief Medical Officer, was required to do more than simply grant the appeal, is a question of fact the jury must decide.

Finally, defendant Traquina recounts various medical tests he has approved on behalf of plaintiff, and other hospitalizations of which defendant Traquina was aware plaintiff

---

[11]  In addressing defendant Traquina's motion for summary judgment on Chacoan's deliberate indifference claim, the magistrate judge stated:

> Evidently there was no effective policy to catch the scheduling mistakes, or just plain inaction.  Knowing that there is an ineffective computer system does not relieve a manager of formulating some policy, manual or otherwise, to deal with the problem.  Just throwing up one's hands is not a defense to liability. This case is a poster child for demonstrating what happens when there is no policy to catch scheduling slip-throughs, or no policy for establishing follow-through.  Dr. Hall, the specialist, had to request ear surgery four times or more, and the needed surgery took nearly *two years to be performed from the first request.*

Chacoan, at *11.

had undergone. (Dkt. No. 28-4 at 6-7.)  However, other than the 2007 knee replacement surgery, none of those tests or hospitalizations took place in 2007.  Defendant Traquina ordered medical tests for plaintiff in May, July and October of 2008, and plaintiff was hospitalized for care related to bone cancer on October 6, 2008, but none of those medical services appeared to interfere with, or compete for defendant Traquina's attention in connection with the services provided for plaintiff's right knee replacement.  In other words, plaintiff did not have medical issues that required prioritizing over the care provided for his knee replacement in 2007 or early 2008.

### d. Defendant Rallos

The record reflects that defendant Rallos was aware of the March 8, 2007 order, because she noted the order on March 20, 2007, and ordered plaintiff outside physical therapy in response to Dr. Shifflett's order.  Thus, Dr. Shifflett's order arguably put defendant Rallos on notice of the risks plaintiff faced absent receipt of "more aggressive" physical therapy.

About a week after the first surgery, on January 31, 2007, defendant Rallos examined plaintiff's right knee.  Forty-eight days later, on March 20, 2007, defendant Rallos examined plaintiff again, and noted that Dr. Shifflett ordered more physical therapy on March 8, 2007.[12]  (Dkt. No. 28 at 3.)  However, defendant Rallos also noted plaintiff was seen by a prison physical therapist on February 20, 2007, and had been instructed on home exercises.  In addition, defendant Rallos made plaintiff an outside referral for physical therapy to plaintiff's right knee.

Here, defendant Rallos was in the unique position of having examined plaintiff's knee one week post-surgery, and then again on March 20, 2007, after Dr. Shifflett ordered "more aggressive" physical therapy because plaintiff presented "worse than before."  Arguably, defendant Rallos should have noted the change in plaintiff's knee.  Indeed, although plaintiff's flexion was 100 degrees on March 8, 2007, defendant Rallos charted plaintiff's flexion as 90

---

[12]  Although defendant Rallos declares that he noted Dr. Shifflett ordered "more physical therapy" for plaintiff on March 8, 2007, both orders written by Dr. Shifflett on March 8, 2007, specifically ordered "more aggressive physical therapy."  Dkt. No. 27-9 at 26-27.)  In addition, on the referral form, defendant Rallos wrote "more PT recommended."  (Dkt. No. 28-1 at 10.)

1   degrees only twelve days later, after receiving no physical therapy.  The condition of plaintiff's

2   knee, as well as Dr. Shifflett's order, raises an inference that Dr. Rallos was deliberately

3   indifferent to rely on physical therapy provided on February 20, 2007.

4   Moreover, the outside referral form provides the words "emergent, urgent or

5   routine" for the physician to indicate the level of service required.  Defendant Rallos circled none

6   of these words. (Dkt. No. 28-1 at 10.)  Defendant Rallos noted that plaintiff saw Dr. Shifflett on

7   March 8, 2007, and recommended more physical therapy.  Defendant then writes that plaintiff

8   "relates not getting enough physical therapy here?" (Dkt. No. 28-1 at 10.)  The inclusion of a

9   question mark can be viewed in different ways.  However, viewing this in the light most

10  favorable to plaintiff, the question mark suggests that defendant Rallos questioned plaintiff's

11  claim that he wasn't getting enough physical therapy at CSP-Solano, which, in light of Dr.

12  Shifflett's March 8, 2007 order, raises an inference that defendant Rallos was deliberately

13  indifferent to Dr. Shifflett's order for "more aggressive" physical therapy.  Importantly, because

14  plaintiff was provided no physical therapy between March 8 and March 20, an almost two week

15  period, it is reasonable to infer that defendant Rallos was deliberately indifferent to Dr. Shifflett's

16  order by not taking steps to ensure plaintiff received "more aggressive" physical therapy.

17  Finally, during the March 20, 2007 appointment, defendant Rallos addressed

18  plaintiff's pain medications, ordered lab work for his other medical issues, and, in response to

19  plaintiff's complaints of breast pain for two weeks, diagnosed and ordered a referral for a cystic

20  breast mass. (Dkt. No. 28-1 at 9.)  The referral for the cystic breast mass was not marked as

21  urgent. (Id.)  Therefore, none of the treatment provided by defendant Rallos for these other

22  medical issues appeared to obscure plaintiff's need for physical therapy for his right knee.

23  Moreover, on April 5, 2007, defendant Rallos had another opportunity to comply

24  with Dr. Shifflett's order, when defendant Rallos responded to plaintiff's March 21, 2007

25  administrative appeal.  By that date, 28 days had passed since Dr. Shifflett's order, and plaintiff

26  had not received any outside physical therapy.  However, defendant Rallos simply noted

33

1   plaintiff's February 20, 2007 consult with the prison physical therapist, and remarked that

2   defendant Rallos  gave plaintiff a referral for outside physical therapy.  Indeed, defendant Rallos'

3   handwritten response to plaintiff's appeal states:

4           You were seen for a physical therapy consult on 2/20/07 and you
            were given instructions on how to do range of motion.  On 20 Mar
5           2007 you were seen by Dr. Rallos and a referral for outside
            physical therapy was written.
6

7   (Dkt. No. 28-6 at 4.)

8           By April 5, 2007, viewing the evidence in the light most favorable to plaintiff, it

9   was apparent through this appeal that plaintiff had not received "more aggressive" physical

10  therapy.  Despite Dr. Shifflett's March 8, 2007 order, defendant Rallos again relied on an

11  outdated consult (February 20, 2007), and took no steps to ensure plaintiff received a timely

12  appointment with the in-prison physical therapist or an outside physical therapist.  By the time

13  petitioner saw Dr. Shifflett on March 8, 2007, petitioner's knee was worse, resulting in the "more

14  aggressive" physical therapy order.  Thus, defendant Rallos' reference to outdated physical

15  therapy, and reliance on range of motion exercises plaintiff must do on his own, raises an

16  inference that defendant Rallos was deliberately indifferent to plaintiff's serious medical needs as

17  well as Dr. Shifflett's order.  Indeed, defendant Rallos did not order another outside physical

18  therapy referral, but instead relied on the March 20, 2007 referral.  In addition, defendant Rallos

19  did not order a new x-ray or write a referral for plaintiff's follow-up appointment with Dr.

20  Shifflett, which was due on or about April 19, 2007, only two weeks from the date defendant

21  Rallos addressed plaintiff's appeal.

22          Finally, it was not until over eight months later, on November 16, 2007, that

23  defendant Rallos asked that a physical therapy referral be expedited, and that was a referral for

24  the prison physical therapist.  (Dkt. No. 28-1 at 13.)

25          Although defendant Rallos later learned that plaintiff saw the prison physical

26  therapist on April 3, 2007, defendant Rallos' notes from the March and April encounters with

34

1   plaintiff do not reflect this knowledge, and therefore cannot be considered in connection with

2   defendant Rallos' subjective awareness on those dates.  Even if it did, there is still a triable issue

3   of material fact as to whether the April 3, 2007 physical therapy session constitutes "more

4   aggressive" physical therapy as ordered by Dr. Shifflett, and in light of defendants' repeated

5   referrals for outside physical therapy.

6          Further, defendant Rallos claims she is not a physical therapist.  However, she is

7   an educated health care provider, physician and surgeon.  At a minimum, Dr. Shifflett's March 8,

8   2007 order put her on notice that the physical therapy Spriggs provided on February 20, 2007,

9   was not sufficient.  As plaintiff's first treating physician to see plaintiff after Dr. Shifflett's

10  March 8, 2007 report, defendant Rallos should have noted the changes in plaintiff's right knee, as

11  well as the fact that no physical therapy had been provided since that order, so it was important

12  for defendant Rallos to take steps to ensure plaintiff received physical therapy in response to Dr.

13  Shifflett's order.  Dr. Shifflett noted that "more aggressive" physical therapy was required to

14  avoid manipulation under anesthesia, or to avoid the premature failure of the joint, which should

15  have alerted defendant Rallos to the substantial risk of harm that plaintiff faced unless defendant

16  Rallos took steps to ensure plaintiff was provided the physical therapy.  Plaintiff asked for the

17  "more aggressive" physical therapy that Dr. Shifflett ordered.  Plaintiff filed an administrative

18  appeal to receive the additional physical therapy, reminding defendant Rallos that plaintiff was

19  not getting "more aggressive" physical therapy.  Thus, there is sufficient circumstantial evidence

20  to support an inference that defendant Rallos was subjectively aware of plaintiff's serious

21  medical need for physical therapy.

22          Therefore, the above evidence is sufficient to create a material issue of fact on the

23  question of the subjective awareness of defendant Rallos.  Viewing this evidence in the light

24  most favorable to plaintiff, plaintiff raises a triable issue of material fact as to whether defendant

25  Rallos was deliberately indifferent to plaintiff's serious medical needs by failing to comply with

26  Dr. Shifflett's order, and failing to ensure or expedite plaintiff's access to "more aggressive"

1   physical therapy.

2                    e.  Defendant Rohrer

3              By May 17, 2007, defendant Rohrer became aware of Dr. Shifflett's order when

4   he interviewed plaintiff in connection with his first level administrative appeal wherein plaintiff

5   specifically referred to Dr. Shifflett's March 8, 2007 order for "aggressive physical therapy."

6   (Dkt. No. 28-6 at 4.)  The record reflects defendant Rohrer became aware of Dr. Shifflett's order

7   two months and nine days after the "more aggressive" physical therapy order issued.

8              Thus, defendant Rohrer's role at this point is more attenuated than defendant

9   Rallos' role.  Defendant Rohrer was not treating plaintiff, and was not responsible for ruling on

10  plaintiff's administrative appeal.  Rather, defendant Rohrer was tasked with interviewing

11  plaintiff for the appeal.  It was A. Noriega, M.D., who provided the formal response to plaintiff's

12  first level appeal.  (Dkt. No. 28-6 at 11-12.)  Dr. Noriega noted that plaintiff had been referred to

13  an outside physical therapist, and that "our schedulers have been contacted to expedite this

14  referral."  (Dkt. No. 28-6 at 11.)  Because plaintiff's appeal resulted in a request to expedite the

15  referral, defendant Rohrer's role in interviewing plaintiff for this appeal cannot be construed as

16  deliberately indifferent.

17             Indeed, defendant Rohrer took an additional step in attempting to obtain physical

18  therapy for plaintiff.  In addition to submitting another outside physical therapy referral on May

19  15, 2007,[13] defendant Rohrer charted the following on May 16, 2007:  "Please fax orthopedic

20  note from 3/8/07 and physical therapy referrals 5/10/07 and March 20, 2007 to ext 3202."  (Dkt.

21  No. 29-1 at 12.)  Defendant Rohrer stated that prison records reflected that plaintiff saw the

22  prison physical therapist on February 20, 2007, and April 3, 2007, but defendant Rohrer still

23  made a referral for plaintiff to see an outside physical therapist on May 15, 2007, and asked that

24  the prior orders be faxed, arguably in an effort to expedite the referral.  The documents appended

25

26        [13]  A copy of the May 15, 2007 referral form was not provided by defendant Rohrer (dkt.
    no. 29, *passim*), so the court cannot determine whether it was marked routine or urgent.

                                          36

to Dr. Noriega's response included defendant Rohrer's two orders for an appointment for plaintiff to see Dr. Shifflett for a post-operative follow-up.  (Dkt. No. 28-4 at 5.)

Defendant Rohrer did not see plaintiff again until January 28, 2008, for follow-up after plaintiff presented at the medical line on January 22, 2008.  (Dkt. No. 29-1 at 14.)  Defendant Rohrer ordered a follow-up for a tumor on plaintiff's femur, and a specialist at QVH to perform the Indium scan ordered by Dr. Shifflett on January 18, 2008.  On November 24, 2008, defendant Rohrer ordered plaintiff's chart for review.  (Dkt. No. 29-1 at 15.)  Defendant Rohrer performed a blood pressure check on June 18, 2008.  (Dkt. No. 29-1 at 16.)  On July 9, 2009, defendant Rohrer examined plaintiff for follow-up for plaintiff's systemic sarcoidosis, for which plaintiff had recently been hospitalized.  (Dkt. No. 29-1 at 17.)  Defendant Rohrer noted an x-ray revealed possible loosening, and that the re-do of the total knee replacement was pending.  Defendant Rohrer ordered plaintiff referred to orthopedics.  (Dkt. No. 29-1 at 19.)  Dr. Rohrer noted that plaintiff's orthopedic follow-up appointment with Dr. Shifflett was pending.  (Dkt. No. 29-1 at 14.)

However, by January 18, 2008, Dr. Shifflett opined that plaintiff's right knee prosthetic had likely loosened, and plaintiff would probably require revision.  Thus, it appears that any harm suffered as a result of the failure to provide physical therapy in response to the March 8, 2007 order, occurred some time between March 8, 2007 and January 18, 2008.  Therefore, defendant Rohrer's treatment on January 28, 2008 and later is not relevant to the provision of physical therapy.[14]

Finally, the record reveals that defendant Rohrer appropriately treated plaintiff prior to Dr. Shifflett's March 8, 2007 order.  Defendant Rohrer examined plaintiff on February 5, 2007, and February 9, 2007, and referred plaintiff to physical therapy on both occasions.

---

[14]  However, the further delay until June 23, 2010, when the revision of the right knee was performed (¶ 59 above), may be relevant to plaintiff's claim of deliberate indifference to the pain he was suffering.

Plaintiff had a consult with the in-prison physical therapist on February 20, 2007.  On February 26, 2007, defendant Rohrer referred plaintiff for a follow-up appointment with Dr. Shifflett, which took place on March 8, 2007.  This evidence supports this court's finding that defendant Rohrer was not deliberately indifferent to plaintiff's serious medical needs.

Plaintiff fails to demonstrate that defendant Rohrer's interview of plaintiff for the first level appeal is sufficiently linked to the failure of plaintiff's treating physicians or of those physicians assigned to decide plaintiff's appeals to establish liability for the delay in receipt of physical therapy ordered by Dr. Shifflett on March 8, 2007.  Defendant Rohrer's role after March 8, 2007, is too attenuated; thus, the court finds that defendant Rohrer is entitled to summary judgment.

f.  Defendant Mahon-Howe

On May 10, 2007, defendant Mahon-Howe became aware of Dr. Shifflett's March 8, 2007 order when she reviewed plaintiff's medical records, noted Dr. Rallos' March 20, 2007 referral to outside physical therapy, and specifically referred to "aggressive outside PT" in her May 10 referral.  (Dkt. No. 28-10 at 2.)  Thus, defendant Mahon-Howe, a family nurse practitioner, became aware of Dr. Shifflett's order a little over two months after the order issued.

The record reflects that defendant Mahon-Howe, took the following steps on the following dates:

- On May 10, 2007, made a referral for plaintiff to receive outside physical therapy and noted that a referral for outside physical therapy had been pending since March 20, 2007.

- On May 31, 2007, saw plaintiff and noted plaintiff did not have full flexion or full extension.  (Dkt. No. 28-8 at 4.)  Noted plaintiff had been referred to an outside physical therapist, but that they were waiting for the therapist to call and schedule an appointment.

- On June 8, 2007, ordered an x-ray of plaintiff's right knee.

38

1       •     On June 26, 2007, ordered a referral to Dr. Shifflett.

2       •     On July 6, 2007, filled out a QVH form for physical therapy for plaintiff

3             for four to six visits within four weeks.  (Dkt. No. 28-8 at 4.)

4       •     On October 5, 2007, ordered  a referral to QVH for physical therapy on an

5             urgent basis.

6       •     On October 9, 2007, noted that plaintiff's physical therapy appointment at

7             QVH was mysteriously canceled.

8       •     After determining the appointment was canceled in error, on October 9,

9             2007, defendant Mahon-Howe filled out another referral for physical

10           therapy at QVH on an urgent basis, circling the word urgent and also

11           stamping the word "urgent" in half-inch sized letters on the referral form.

12           (Dkt. No. 28-10 at 17.)

13      Thus, defendant Mahon-Howe's role presents a close question.  By the time

14 defendant Mahon-Howe saw plaintiff on May 10, 2007, a little more than two months after Dr.

15 Shifflett's order, plaintiff had received additional physical therapy from Spriggs on April 3, 2007,

16 and plaintiff had showed up and left the May 1, 2007 appointment with Spriggs.  Although

17 defendant Mahon-Howe noted on May 10 that plaintiff was waiting for outside physical therapy

18 since March 20, 2007, by the time she saw plaintiff on May 31, 2007, plaintiff had seen Spriggs

19 for more physical therapy on May 15, 2007.  In addition, plaintiff's treating physician, defendant

20 Rallos, had not marked plaintiff's referral for outside physical therapy as urgent.  By May 31,

21 2007, defendant Rohrer had also written a routine referral for outside physical therapy.  In light

22 of defendant Mahon-Howe's role as nurse practitioner, it is reasonable to infer that defendant

23 Mahon-Howe deferred to the physician's determination that a routine referral was sufficient.

24 This inference is supported by defendant Mahon-Howe's later actions in expediting referrals

25 once it came to her attention that plaintiff was not receiving the outside physical therapy.

26      Moreover, it appears defendant Mahon-Howe was the first medical provider to

1    notice plaintiff had not received a new x-ray or the follow-up appointment with Dr. Shifflett.

2    Defendant Mahon-Howe wrote referrals for both.  Also, defendant Mahon-Howe was the only

3    prison medical provider who ordered a specific plan for continuous physical therapy, for four to

4    six visits within four weeks.  Finally, it appears defendant Mahon-Howe followed-up, albeit

5    belatedly, and ordered urgent physical therapy on October 5, 2007.  Mahon-Howe followed up

6    again when plaintiff's appointment was mysteriously canceled, and wrote another urgent referral

7    for outside physical therapy.

8            In light of defendant Mahon-Howe's late involvement, and the fact that prior

9    physicians had written routine referrals for outside physical therapy, and plaintiff had received

10   some additional physical therapy, this court cannot find that defendant Mahon-Howe was

11   deliberately indifferent to plaintiff's serious medical needs.  Any delay plaintiff experienced at

12   the hands of defendant Mahon-Howe was, at most, mere negligence or medical malpractice.

13   Thus, defendant Mahon-Howe is entitled to summary judgment.

14                    g.  Alleged Harm Caused

15           Plaintiff contends that he suffered pain, swelling, loosening, and ultimately lost

16   his first right knee prosthetic, because defendants failed to provide plaintiff the "more

17   aggressive" physical therapy ordered by Dr. Shifflett on March 8, 2007.  Plaintiff contends

18   defendants failed to follow-up or to ensure that plaintiff timely received the physical therapy.

19           Defendants contend that plaintiff received some physical therapy, and that the

20   failure to provide "more aggressive" physical therapy was not deliberately indifferent, but was, at

21   most, negligence.  Spriggs' April 3, 2007 report noted plaintiff's persistent edema, suggested

22   plaintiff's knee replacement surgery was complicated, and stated that plaintiff's limitation in

23   active range of motion was "largely the result of fluid retention."  (Dkt. No. 32 at 28.)  Also, at

24   the January 18, 2008 follow-up appointment, although Dr. Shifflett noted his concern that

25   plaintiff may have loosening, he did not mention physical therapy, or attribute plaintiff's

26   condition to a lack of receiving "more aggressive" physical therapy as he previously ordered.  Dr.

1   Shifflett, plaintiff's treating physician, could not "establish a causal relationship between lack of

2   the "more aggressive" physical therapy and the failure of the 2007 knee replacement.  Finally, it

3   is undisputed that there can be other causes for the failure of a knee replacement, as well as a lack

4   of flexion, unrelated to the provision of physical therapy.  All of this contrasting evidence raises

5   an inference that plaintiff suffered unique complications following his first right knee

6   replacement surgery, and that any subsequent harm was the result of unusual complications

7   rather than the failure of defendants to provide "more aggressive" physical therapy.

8          Plaintiff is not required to show that his harm was substantial; a showing of

9   substantial harm "provide[s] additional support for the inmate's claim that the defendant was

10  deliberately indifferent to his needs."  Jett, 439 F.3d at 1096.  The needless suffering of pain may

11  be sufficient to demonstrate further harm.  Clement v Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

12         Thus, while there is evidence of an objective risk of harm absent the "more

13  aggressive" physical therapy ordered by Dr. Shifflett, there are other possible causes for the

14  reduced flexion in plaintiff's knee, and for the ultimate failure of plaintiff's first knee prosthetic.

15  Therefore, there is a triable issue of material fact as to whether the failure to provide the "more

16  aggressive" physical therapy ordered by Dr. Shifflett caused plaintiff further harm.  While a

17  showing of "substantial harm" is not required, whether the failure to provide plaintiff "more

18  aggressive" physical therapy caused plaintiff harm must be submitted to a jury to decide.

19                    h.  Overall Care

20         First, defendants ask the court to view all of the medical care plaintiff received

21  from defendants for his myriad medical problems, including his knee replacement, and find that

22  any delay in his receipt of physical therapy was mere negligence, or an isolated occurrence

23  amidst the total medical care that plaintiff received.  (Dkt. No. 38 at 6, citing Toguchi v. Chung,

24  391 F.3d 1051, 1062 (9th Cir. 2004), and McGuckin v. Smith, 974 F.2d at 1060 (9th Cir. 1992).)

25         Plaintiff asks the court to view how serious knee replacement surgery is, and how

26  difficult it is to retain a prosthetic knee absent appropriate physical therapy, particularly when the

41

treating orthopedic surgeon orders "more aggressive" physical therapy.

The instant case is distinguishable on its facts from both <u>Toguchi</u> and <u>McGuckin</u>. In <u>Toguchi</u>, the plaintiff had a very serious mental illness, and the challenged medical care involved accurately diagnosing and prescribing appropriate medication for that mental illness. <u>Id.</u> In <u>McGuckin</u>, the plaintiff suffered a back injury and was trying to obtain surgery, but the "vast majority of the delay" took place while he was at a different prison and was under other doctors' care. <u>Id.</u> at 1062. Here, plaintiff was provided knee replacement surgery, and his treating orthopedic surgeon specifically ordered "more aggressive" physical therapy. In <u>Toguchi</u>, the court found the doctor was consistently responsive to the patient's needs. In the instant case, while defendants contend that they were not deliberately indifferent because they completed referrals to outside physical therapy, those routine referrals were completed despite Dr. Shifflett's specific order, as well as their knowledge that plaintiff had not yet had outside physical therapy despite prior referrals, and their failure to mark the referrals urgent or priority in response to Dr. Shifflett's order.

Moreover, as discussed above, none of plaintiff's other medical issues were timed in such a way as to diminish the prioritization of treatment for plaintiff's knee replacement, and did not obscure the need for physical therapy, particularly in light of Dr. Shifflett's order.

Thus, this court finds that defendants' medical care offered for plaintiff's ailments unrelated[15] to his knee replacement surgery are not relevant to the instant action, and tend to obscure the issue of whether defendants failed to act despite knowledge that their conduct could cause a substantial risk of harm to plaintiff. However, all medical care provided in connection

---

[15]  Although plaintiff had numerous unrelated medical issues, it does not appear that they occurred at the same time as plaintiff's January 2007 knee replacement surgery, or shortly thereafter. For example, plaintiff was hospitalized in 2000 for cervical spondylosis mylopathy, on October 6, 2008, for care related to a question of bone cancer, and on June 15, 2009, for reasons related to a diagnosis of systemic sarcoidosis. (Dkt. No. 28-4 at 7.) These hospitalizations, and their related medical tests and care, do not appear to have obscured the need for treatment of plaintiff's knee.

1   with plaintiff's right knee replacement, subsequent to the replacement surgery, is relevant.

2           Second, defendants contend that they cannot be held deliberately indifferent if

3   they ordered physical therapy for plaintiff because plaintiff received some physical therapy, and it

4   was not within their power to set an appointment for physical therapy or to arrange for plaintiff to

5   go to physical therapy.  Defendants aver it is the prison's utilization review department

6   schedulers who are responsible for acquiring appointments with outside providers and scheduling

7   those appointments.  Plaintiff, however, contends that once defendants became aware plaintiff

8   was not receiving physical therapy, it was defendants' responsibility to follow-up, and to ensure

9   and to expedite the receipt of physical therapy for plaintiff, particularly in light of the known risk

10  to plaintiff's right knee prosthesis.

11          A failure to competently treat a serious medical condition, even if some treatment

12  is prescribed, may constitute deliberate indifference in a particular case.  Ortiz, 884 F.2d at 1314.

13          The undisputed facts show that on March 8, 2007, Dr. Shifflett ordered "more

14  aggressive" physical therapy, and a "more aggressive exercise program," and that plaintiff return

15  in six weeks with a new x-ray.  Dr. Shifflett explained why "more aggressive" physical therapy

16  was needed.  (Dkt. No. 27-9 at 26.)  Thus, Dr. Shifflett's order put plaintiff's care providers on

17  notice of the serious risks plaintiff faced absent receipt of "more aggressive" physical therapy.

18          It is undisputed that plaintiff received the following physical therapy after March

19  8, 2007:

20          April 3, 2007 in-prison physical therapy with Spriggs

21          May 1, 2007 appointment with Spriggs, but plaintiff showed up and left

22          May 15, 2007 in-prison physical therapy with Spriggs

23          July 6, 2007 outside prison physical therapy at QVH[16]

24

25      [16]  Defendant Mahon-Howe declares that plaintiff had other physical therapy
    appointments scheduled at QVH for September 10 and October 20, 2007.  However, the record is
26  not clear whether plaintiff attended those appointments, and it appears neither party provided

1          Viewing this evidence in the light most favorable to plaintiff, this record supports

2    an inference that plaintiff did not receive "more aggressive" physical therapy as Dr. Shifflett

3    ordered on March 8, 2007.  See Ruiz v. Akintola, 2010 WL 1006435 (E.D. Cal. 2010) (prisoner

4    at Mule Creek State Prison, who had ACL reconstruction surgery on his knee, despite not

5    receiving physical therapy for a little over a month after surgery, then received 27 sessions of

6    physical therapy.)[17]  Plaintiff further challenges the physical therapy provided on these occasions,

7    arguing it was not "hands on" or "aggressive" physical therapy.  Physical therapist Spriggs was

8    not deposed, and defendants did not produce evidence demonstrating the type of physical therapy

9    available at CSP-Solano at the relevant times, i.e. whether CSP-Solano had a physical therapy

10   room with exercise equipment.  Moreover, the fact that defendants continued to refer plaintiff to

11   outside physical therapy supports an inference that defendants were aware that the in-prison

12   physical therapy provided was not sufficient to meet Dr. Shifflett's March 8, 2007 order.

13          Although plaintiff was referred to an outside physical therapist on several

14   occasions, he didn't see an outside physical therapist until almost four months later, on July 6,

15   2007.  Plaintiff contends he did not receive hands-on therapy on that visit either, but was simply

16   instructed on home exercises.  Declarations by defendants Traquina and Mahon-Howe confirm

17   that plaintiff was given a home exercise program at that appointment.  (Dkt. No. 28-4 at 5; 28-8

18   at 4.)  Defendant Rohrer did not include a copy of a report from the July 6, 2007 visit in the

19   physical therapy exhibits provided.  (Dkt. Nos. 30-32.)  On July 6, 2007, defendant Mahon-Howe

20   filled out a QVH form for physical therapy for plaintiff for four to six visits within four weeks.

21   _____

     copies of the reports from plaintiff's visits to QVH for post-surgery physical therapy.

22

23          [17]  Ruiz had surgery on November 12, 2008, and first had physical therapy on December
     15, 2008.  Id. at *4.  The defendants argued that there was no record from the hospital that Ruiz'

24   physical therapy was to begin immediately, but the court found that prison medical records
     stating Ruiz was "awaiting physical therapy" raised a reasonable inference that physical therapy

25   was to begin soon.  Id. at *7.  Ultimately, on the issue of physical therapy, the court found that
     Ruiz failed to adduce evidence demonstrating he was harmed by the delay in receiving physical

26   therapy, particularly in light of medical evidence demonstrating his ACL problem had healed, but
     that he sustained a new injury by too much walking.  Id. at *8.

(Dkt. No. 28-8 at 4.)  But, it is undisputed that plaintiff did not receive physical therapy for four to six visits within four weeks after her order.  Although plaintiff may have been scheduled for physical therapy at QVH on September 10 and October 20, 2007, there is no evidence plaintiff attended those appointments.

Plaintiff presented a declaration by Dr. Jon Greenfield, who specializes in orthopedic surgery, stating that physical therapy is critical for knee replacement patients, and that the failure of defendants to ensure plaintiff received hands on physical therapy was a cause for the plaintiff's knee replacement failure.  Defendants argue that plaintiff received myriad other medical services, and that defendants wrote referrals for plaintiff to be seen by an outside physical therapist, thus demonstrating defendants were not deliberately indifferent to plaintiff's serious medical needs.

"If the harm is an 'isolated exception' to the defendant's 'overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference.'"  Jett, 439 F.3d at 1096 (citations omitted).

Here, however, plaintiff's expert opines that:

> the prison should not allow inmates to have joint replacement surgery without having the proper post-operative physical therapy services available.  A joint failure is a serious matter as revision surgery is difficult and the chances of permanent disability of the joint greatly increases following a replacement failure.  The risk of failure of a knee prosthetic joint is significantly increased in the absence of physical therapy.  Moreover, the risk of failure for a revision surgery (re-do of the joint replacement surgery) is much higher than the risk of failure after an initial joint replacement surgery.

(Dkt. No. 37 at 3.)  Arguably, a joint replacement presents a unique health care challenge that requires post-operative physical therapy.  Dr. Greenfield's position appears to be supported, at least in part, by Dr. Shifflett's March 8, 2007 order.  The instant case does not present issues where medical providers provided pain medications and discussed treatment options with plaintiff in lieu of ordering surgery or outside consultations, or where plaintiff's other medical

conditions obscured his need for physical therapy.

Rather, plaintiff received knee replacement surgery and, following an initial failure to provide frequent, hands on physical therapy, with exercise equipment,[18] to plaintiff once he returned to prison, plaintiff presented to Dr. Shifflett on March 8, 2007, "worse than when [plaintiff] left." (Dkt. No. 27-3 at 22.)  This examination resulted in Dr. Shifflett's specific order that plaintiff receive "more aggressive" physical therapy, and return in six weeks with a new x-ray, and Dr. Shifflett set forth specific reasons why the therapy was required.

Despite the fact that defendants Rallos and Traquina were aware, either by treating plaintiff, or by addressing his administrative appeal, that plaintiff wasn't receiving outside physical therapy, they took no additional steps to ensure plaintiff received outside physical therapy.  Moreover, despite their awareness that plaintiff wasn't getting the outside physical therapy appointments, it appears they did not request plaintiff receive additional in-prison physical therapy.  This lack of request raises another inference that defendants Rallos and Traquina knew that the type of physical therapy provided at CSP-Solano was not the physical therapy that Dr. Shifflett's order contemplated.[19]  Finally, if there were insufficient physical therapy providers either at CSP-Solano, or on contract with CSP-Solano, defendant Traquina could have recommended plaintiff be transferred to a facility that provided "more aggressive" physical therapy.[20]

The fact that defendants Rallos and Traquina could have expedited plaintiff's receipt of outside therapy by circling the word "urgent" on the referral form, also raises an

---

[18]  It is undisputed that Dr. Shifflett ordered plaintiff to be provided a CPM machine for plaintiff to use six hours per day.

[19]  Although on November 16, 2007, defendant Rallos made a referral for plaintiff to be seen by the prison physical therapist on an expedited basis, this was over eight months after Dr. Shifflett's order.

[20]  At deposition, Dr. Traquina testified that CMF had difficulties providing physical therapy for their own patients, and therefore CSP-Solano could not send inmates to CMF for outpatient physical therapy services.  (Traquina Dep. at 50-51.)

1   inference that they were deliberately indifferent to plaintiff's serious need for physical therapy.

2   Although each defendant claims he or she could only issue referrals, and were not responsible for

3   scheduling, the record reflects that there were additional steps each defendant could have taken to

4   get plaintiff physical therapy.  The record shows that medical professionals were able to mark

5   referral forms "urgent," or "ASAP," or "expedite," and were also able to call scheduling to

6   expedite referrals, or have urgent requests faxed to QVH.

7            Viewed in the light most favorable to plaintiff, the issuance of "routine" physical

8   therapy referrals, despite Dr. Shifflett's specific order for "more aggressive" physical therapy,

9   raises an inference that defendants Rallos and Traquina were ignoring that order, particularly as

10  time wore on.  See Wakefield, 177 F.3d at 1165 (allegations that a prison official ignored the

11  instructions of a prisoner's treating physician are sufficient to state a claim for deliberate

12  indifference).  The multiple routine referrals issued over time rebut defendants' contention that

13  the failure to provide "more aggressive" physical therapy was an isolated occurrence or mere

14  negligence.  The undisputed evidence demonstrates that referrals for outside physical therapy

15  were pending for months before an appointment was finally scheduled.  Based on the delays

16  plaintiff encountered despite the repeated routine referrals for outside physical therapy, a

17  reasonable jury could find that the issuance, and re-issuance, of routine referrals, despite Dr.

18  Shifflett's order, constitute deliberate indifference.

19           It is also undisputed that plaintiff did not get a new x-ray until June 16, 2007.

20  Plaintiff did not have a follow-up appointment with Dr. Shifflett until January 18, 2008, 316 days

21  (or 10 months and 10 days) after Dr. Shifflett ordered plaintiff's return in six weeks with a new

22  x-ray.  Plaintiff contends that his outcome might have been different if plaintiff had been timely

23  seen by Dr. Shifflett.  The delay in receipt of the new x-ray, as well as the lengthy delay in

24  plaintiff's return for a follow-up appointment with Dr. Shifflett, raise an inference that

25  defendants were deliberately indifferent to plaintiff's serious medical needs.

26           Thus, the court finds that the delays suffered by plaintiff in this case are more akin

47

to the delays suffered by the plaintiff in Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (denial of summary judgment where state prisoner, who fractured his thumb, submitted probative evidence of defendants' purposeful refusal to treat and resulting harm.)

In Jett, the court stated, "[T]he record is replete with evidence showing the delay was harmful." The objective evidence included radiology reports that plaintiff's thumb, which was fractured while he was housed in a California prison, was deformed because the fracture was set incorrectly, creating a genuine issue of fact as to whether the prison doctors' treatment and delay in referring him to an orthopedist caused the deformity. Jett, 439 F.3d at 1098. The Ninth Circuit found a triable issue of fact regarding deliberate indifference by a prison physician who failed to ensure that an inmate timely saw an orthopedist to set and cast his fractured thumb.

In Jett, the defendant physician, who saw the inmate almost two months after the fracture occurred and was diagnosed, recognized that the inmate needed to see an orthopedist to have his thumb cast, because it was not healing well. Nonetheless, the defendant physician did not take steps to ensure a prompt orthopedic consultation. Id. at 1097. As a result, the fracture did not align upon healing, and by the time the inmate saw an orthopedic specialist six months after the injury and a hand specialist a year later, his thumb was deformed. Id. at 1095, 1098.

Jett suffered numerous delays[21] while awaiting referral to an orthopedic specialist for a thumb injury, and at least one of the doctors marked the referral as "urgent." Meanwhile,

---

[21]  Jett injured his thumb on October 27, 2001. Id. at 1094. An outside doctor diagnosed the plaintiff with a fractured thumb, prescribed pain medication, placed the thumb in a temporary splint, and advised Jett to see an orthopedic specialist within a week for follow-up. Jett sent various informal notices to inform the prison medical staff about his pain and condition, and requested to have his broken thumb set and casted. Id. After two months without a medical exam, plaintiff was examined by prison Dr. Penner. Despite Dr. Penner's awareness of the prior doctor's recommendation that plaintiff receive an orthopedic consult, Jett was not sent to an orthopedic specialist for over three months. Id. By April 2002, another prison doctor submitted an "urgent" request for an outside consult. Id. at 1095. Later in April, the specialist determined that Jett's hand was not healing properly, and consultation with a hand specialist was ordered. Dr. Penner examined Jett in August, October and November of 2002, each time noting that Jett should see a hand specialist, but failing to ensure the appointment was scheduled each time. Id. Jett received treatment by a hand specialist in May of 2003. Id.

Jett's hand was not healing properly.  Here, plaintiff was suffering reduction in flexion or range of motion and pain.  In Jett, all of the medical examinations reached the same conclusion, that Jett needed to be seen by an orthopedic specialist.  Here, all of the defendants, except for Traquina (dkt. no. 28-4 at 5), ordered outside physical therapy for plaintiff.  Meanwhile, plaintiff's knee was losing flexion and extension, and at least two medical professionals suspected plaintiff was experiencing loosening.  Yet, defendants Rallos and Traquina took no steps to ensure that plaintiff timely received outside or "more aggressive" physical therapy following Dr. Shifflett's March 8, 2007 order.  It was not until November 16, 2007, that defendant Rallos asked for an expedited physical therapy referral to the in prison physical therapist.  Based on this record, a reasonable jury could draw an inference that the delayed physical therapy caused harm to plaintiff.

The instant case is also similar to Lancaster v. Valdez, 2011 WL 2470680 (D. Idaho June 20, 2011).  Lancaster, like plaintiff, sought post-operative physical therapy, but Lancaster received elbow repair surgery.  In Lancaster, the court found that an inference of deliberate indifference was warranted where the evidence showed that Lancaster was initially provided no physical therapy,[22] and that after his transfer to a different prison, defendants failed to provide physical therapy for an additional three months.

Here, plaintiff presents evidence that the delay in providing him "more aggressive" physical therapy caused him harm.  The undisputed evidence demonstrates that there was an almost four month delay before plaintiff was seen by an outside physical therapist after Dr. Shifflett's March 8, 2007 order, and an over 10 month delay before plaintiff was returned to Dr. Shifflett with a new x-ray for follow-up.  Defendants Rallos and Traquina are not entitled to summary judgment here because the failure to provide plaintiff with "more aggressive" physical

---

[22] In Lancaster, however, a physician's assistant examined Lancaster three weeks post surgery and noted, "Left arm flexion contracture due to delay in PT to work on ROM following surgery.  [Patient] states that he had attempted some ROM exercises on his own with little effect."  Id. at *2.

1  therapy, and to ensure plaintiff's timely follow-up appointment with Dr. Shifflett, could support a

2  claim of deliberate indifference against them because they "were, in some part, responsible for

3  plaintiff's medical care while there."  Lancaster, 2011 WL 2470680 at *4.

4                                i.  Additional Arguments

5          At the hearing, defendants argued that in Wilds v. Gines, 2011 WL 737616 (N.D.

6  Cal. 2011), prison medical providers were granted summary judgment, despite delays in

7  providing physical therapy, because the providers treated Wilds "as best they could."  However,

8  Wilds is distinguishable based on the fact that Wilds suffered from chronic low back pain and

9  degenerative disc disease.[23]  This court has recommended granting summary judgment to prison

10  medical providers for an inmate suffering from degenerative disc disease.  Watson v. Swarthout,

11  Case No. 2:07-cv-1871 LKK KJN P (E.D. Cal.) (Dkt. No. 109-11 at 7).  Degenerative disc

12  disease poses its own unique set of medical issues, including serious consideration of the various

13  medical treatment options available.  However, as set forth above, the replacement of a joint, in

14  particular a knee, which is critical for a person's mobility, requires physical therapy in order to

15  ensure functionality and utility, and, as plaintiff's expert opined, and as Dr. Shifflett noted in his

16  March 8, 2007 order, to assist in the success of the replacement joint.

17          Similarly, the instant case is distinguishable from Dancy v. Scribner, 2010 WL

18  5439812 (E.D. Cal. 2010), where the prisoner challenged a delay in surgery to his right "pinky"

19  finger, after a medical doctor already concluded Dancy would not have full function of that

20  finger.  Id. at *1.  However, here, plaintiff already had surgery, and the orthopedic surgeon

21  ordered "more aggressive" physical therapy because plaintiff presented "worse than before," a

22

23          [23]  In Wilds, the court found that there was no evidence that the wait seriously worsened
    Wilds' medical condition or that defendants caused the wait out of deliberate indifference to his
24  condition.  Id.  However, in Wilds, during his wait for physical therapy, the defendants sent
    Wilds back out to an outside doctor to see if Wilds still required physical therapy, and the outside
25  doctor said he was pleased with Wilds' progress, and recommended physical therapy "when
    available."  Id. at *7.  Thus, the outside doctor's order in Wilds is very different from Dr.
26  Shifflett's order that plaintiff Jackson required "more aggressive" physical therapy.

1   little over a month after surgery.  Arguably time was of the essence here, where delays in exercise

2   and physical therapy could affect plaintiff's mobility, as well as risk loss of the knee prosthesis,

3   as demonstrated by Dr. Shifflett's March 8, 2007 order, and plaintiff's expert's opinion.  The

4   judge in <u>Dancy</u> did state that if the nurse practitioner were "truly indifferent to [Dancy's]

5   condition, it is not reasonable that [the nurse practitioner] would have taken the extra effort to

6   reinitiate the surgical authorization."  <u>Id.</u> at *3.  However, the known risk of harm plaintiff faced

7   absent physical therapy raises a material dispute of fact as to whether it was deliberately

8   indifferent for defendants to simply rely on the submission and re-submission of routine referrals

9   for outside physical therapy, when they were aware of the delay plaintiff already suffered, as well

10  as how long it took referrals for physical therapy to be processed.

11          For all of the above reasons, IT IS HEREBY ORDERED that defendants' May 20,

12  2011 motion for summary judgment (dkt. no. 27) is granted as to defendants Rohrer and Mahon-

13  Howe, and denied as to defendants Rallos and Traquina.

14  DATED:  March 27, 2012

15

16  _____

17  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

18  jack3234.msj

19

20

21

22

23

24

25

26

51